# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 21-0786V

|  |  |
|---|---|
| KATHRYN ALEXANDER,<br><br>               Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>               Respondent. | Chief Special Master Corcoran<br><br><br>Filed: January 14, 2025 |

*Mark Theodore Sadaka, Law Offices of Sadaka Associates, LLC, Englewood, NJ, for Petitioner.*

*Austin Joel Egan, U.S. Department of Justice, Washington, DC, for Respondent.*

### (I) FINDINGS OF FACT AND CONCLUSIONS OF LAW DISMISSING TABLE CLAIM AND (II) ORDER TO SHOW CAUSE[1]

     Kathryn Alexander alleges that she suffered a "shoulder injury related to vaccine administration ("SIRVA"), and chronic left shoulder pain, that were either 'caused-in-fact'… or significantly aggravated by" a pneumococcal conjugate vaccine ("PCV," or "Prevnar 13") received on January 26, 2018. Petition filed Jan. 22, 2021 (ECF No. 1) at Preamble.[2] The claim was assigned to the Special Processing Unit (the "SPU") in May 2022 (ECF No. 23). After Petitioner filed additional medical records, Respondent completed his review and advised that he would defend against the claim. Rule 4(c) Report filed Sept. 13, 2024 (ECF No. 59). No further filings have been received.

---

[1] Because this unpublished Ruling contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] *See also* Amended Petition filed Aug. 23, 2022 (ECF No. 30) (adding citations to additionally obtained medical records but alleging the same injury); *but see* PAR Questionnaire filed Nov. 12, 2021 (ECF No. 30) at 1 (listing a vaccine injury of "cervical radiculopathy and exacerbation of chronic pain syndrome").

Because the record does not support the conclusion that Petitioner's injury was limited to the vaccinated shoulder, *and* reveals the existence of potentially more likely explanations (specifically ankylosing spondylitis ("AS") and cervical radiculopathy ("CR")), her Table SIRVA claim must be **DISMISSED**. To the extent she wishes to proceed with a causation-in-fact claim, Petitioner must demonstrate that sufficient record evidence to support such a claim has been filed.

## I.    Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). Compensation may not be awarded "based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." Section 13(a)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, 2005 WL 6117475, at *19.

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

Beyond severity and other requirements concerning the vaccination received, and the lack of other award or settlement, *see* Section 11(c)(1)(A), (B), (D), and (E), a petitioner must establish that he or she either suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Vaccine Injury Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Pursuant to the Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a covered vaccine. 42 C.F. R. § 100.3(a). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support

SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g., NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

If the petitioner's injury does not fit within a Table listing, the petitioner must prove that the administered vaccine was the cause in fact of the injury. Section 11(c)(1)(C)(ii) and (iii). In such circumstances, petitioner asserts a "non-Table or [an] off-Table" claim and to prevail, petitioner must prove the claim by preponderant evidence. Section 13(a)(1)(A). This standard is "one of . . . simple preponderance, or 'more probable than not' causation." *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1279-80 (Fed. Cir. 2005) (referencing *Hellebrand v. Sec'y of Health & Human Servs.*, 999 F.2d 1565, 1572-73 (Fed. Cir. 1993). The Federal Circuit has held that to establish an off-Table injury, petitioners must "prove . . . that the vaccine was not only a but-for cause of the injury but also a substantial factor in bringing about the injury." *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1351 (Fed. Cir 1999).  The received vaccine, however, need not be the predominant cause of the injury. *Id.*

## II.    Record Evidence

- Petitioner was born in 1973. All medical encounters discussed herein occurred in the Portland, Oregon metropolitan area. As Respondent discusses in the Rule 4(c) Report at 2 - 4, Petitioner's medical history included a traumatic brain injury ("TBI")

in 2015, CR,[3] and AS.[4] In May 2016, an x-ray of Petitioner's sacroliliac ("SI") joints found mild sclerosis, Ex. 2 at 335 – 36. In June 2016, X-rays of her spine found scoliosis, moderate C5-C7 degenerative disc disease, and loss of normal cervical lordosis – but no evidence of spondylarthritis. Ex. 3 at 35. Also in June 2016, HLA-B27 testing was positive. Ex. 4 at 553. In August 2016, Petitioner received steroid injections in both hips, and started taking the anti-TNF medication Humira (adalimumab) to treat her diagnosed AS. Ex. 3 at 91 – 95, 116, 123.

- Petitioner received the at-issue Prevnar 13 vaccine in her left deltoid on January 26, 2018. Ex. 4 at 1; Ex. 3 at 298. The vaccination occurred during a rheumatology appointment for management of her AS. Ex. 3 at 298. During that appointment, Petitioner reported that she had recently lost her job, enrolled in a state-sponsored health insurance plan, and had been unable to fill her Humira prescription. *Id.* at 301. She also reported a six to seven-week history of itching and rash on both arms, and additional symptoms of muscle pain, aches, and cramps; joint pain; back pain; and neck pain. *Id.* The rheumatologist reauthorized Petitioner's prescription for Humira. *Id.*

- At a February 9, 2018, primary care appointment, Petitioner complained of a persistent rash. Ex. 2 at 255 (noting: "saw dermatology recently, they noted rash, suspected contact dermatitis"). She also reported "acute on [sic?] chronic neck pain and left deltoid pain" after her vaccination; the arm was "sore, hurts with yoga, and she [was] worried about a reaction." *Id.* A physical examination found a rash on both arms; left deltoid tenderness to palpation; full range of motion ("ROM"); and no weakness. *Id.* Robert E. Morgan, D.O., wrote the "left deltoid pain" was lasting longer than expected, but Petitioner should try gentle exercise and follow up if it did not improve. *Id.*

- On February 23, 2018, Petitioner telephoned her rheumatologist reporting post-vaccination left arm "nerve-type pain," stiffness, weakness, numbness, and tingling. Ex. 3 at 318.

---

[3] Radiculopathy is defined as "disease of the nerve roots, such as from inflammation or impingement by a tumor or a bony spur." Dorland's Medical Dictionary Online (hereinafter "Dorland's"), https://www.dorlandsonline.com/dorland/definition?id=42742 (last accessed Jan. 10, 2025).

[4] Ankylosing spondylitis is "a chronic multisystem inflammatory disorder associated with the presence of HLA-B27 antigen, and thus one of the group of seronegative spondyloarthropathies; it usually initially affects the sacroiliac joints and often later involves other joints of the axial skeleton and peripheral joints, causing pain and progressive stiffness and restricted range of motion. Extra-skeletal manifestations include ocular, pulmonary, cardiovascular, renal, and neurologic complications." Dorland's, https://www.dorlandsonline.com/dorland/definition?id=107826&searchterm=ankylosing+spondylitis (last accessed Jan. 10, 2025).

- Petitioner was scheduled for a March 2, 2018 rheumatology appointment – at which time she recounted: "Ha[ving] a bruise from the vaccine, but then afterward had a deep pain creeping up into her shoulder. Couldn't put weight on the arm. However, after a few days the pain subsided. However, now has tingling in the area of the shoulder that radiates down the arm, has a numb arm in the middle of the night. Tingling also radiates to the neck. Pain even radiates to the jaw." Ex. 3 at 324. Physical examination found slightly decreased sensation at the deltoid, full ROM of the left shoulder with minimal pain on full abduction, and a positive Spurling test.[5] *Id.* at 325. The rheumatologist believed that the "arm numbness/ tingling… symptoms are most consistent with cervical radiculopathy [CR]." *Id.* at 326. Agreeing with Petitioner's preference for conservative treatment, the rheumatologist prescribed gabapentin; offered a physical therapy referral;[6] and "if there is no improvement after 4 – 6 weeks would consider imaging or EMG." *Id.[7]*

- On March 8, 2018, a dermatologist opined that Petitioner did not have signs of a primary dermatologic process, and proposed instead that her rash was more likely secondary to picking and scratching at her skin. Ex. 14 at 93. The "[d]istribution of symptoms [was] most suggestive of brachioradial pruritis, which is… a neuropathic problem. Given her history of neck/spine symptoms, this makes sense." *Id.* Petitioner also complained of pain and numbness in her vaccinated arm – but she had tolerated her first dose of gabapentin well, and no corresponding exam findings, diagnosis, or additional treatment plan was noted in the dermatology record. *Id.* at 92 – 93.

- On March 14, 2018, the PCP Dr. Morgan recorded Petitioner's complaint of "pain significantly worse in the neck lately… located midline lower neck… also has significant discomfort in her neck muscles trapezius and 'rotator cuff.'" Ex. 2 at 269. The PCP's examination found tenderness to palpation over the cervical spine and the bilateral paraspinal, trapezius, rotator cuff, and biceps tendon muscles. *Id.* at 270. The PCP assessed this complaint as AS "of multiple sites in spine." *Id.* at 268. He ordered x-rays of the spine which showed mild to moderate degenerative disc

---

[5] In a Spurling test, "the examiner presses down on the top of the head while the patient rotates the head laterally and into hyperextension; pain radiating into the upper limb ipsilateral to a rotation position of the head indicates radiculopathy."
Dorland's,     https://www.dorlandsonline.com/dorland/definition?id=112983&searchterm=Spurling%20test (last accessed Jan. 10, 2025).

[6] As noted below, Petitioner did not start PT until it was authorized by a different provider in May 2018.

[7] As noted below, Petitioner's next communication with her rheumatologist occurred in May 2018, but her subsequent rheumatology appointment occurred in April 2019. Those records do not describe an ongoing post-vaccination injury. Additionally, Petitioner never underwent imaging or EMG of the left upper extremity.

disease. *Id.* at 337. Additionally, the PCP concurred with the dermatologist's assessment of the rash as representing brachioradial pruritis. *Id.* (noting that "a review of the literature suggests that this may be due to cervical spine neuropathy"). *Id.* at 268. Finally, the PCP believed that Petitioner's new complaints of blurry vision and photophobia could represent uveitis (another condition associated with AS). *Id.*

- On April 4, 2018, the dermatologist suggested that Petitioner undergo an MRI of the cervical spine to evaluate for "an anatomic issue creating compression of the brachioradial nerves." Ex. 14 at 77, 79. But on April 26, 2018, a neurologist[8] deferred an MRI because her "neck pain and pruritis [were…] adequately treated with gabapentin." *Id.* at 82.

- On May 7, 2018, Petitioner reported that her pruritis was much better with increased gabapentin. Ex. 2 at 284. But given her history of AS, a brain injury, x-ray findings of cervical disc degeneration, and "severe cervical radiculopathy," the PCP Dr. Morgan decided to obtain an MRI of the cervical spine. *Id.*

- A May 16, 2018, MRI of Petitioner's cervical spine found multi-level degenerative disc disease, facet arthropathy, and foraminal narrowing. Ex. 2 at 338.

- On May 22, 2018, Petitioner telephoned her rheumatologist, reporting that her Humira dosage was not working, and that she wanted to "inject before it's time to." Ex. 3 at 347. She was offered a June 20th appointment, *id.*, which did not occur.

- Petitioner was referred[9] to PT for a diagnosis of cervicalgia and a goal of treating cervical pain. Ex. 13 at 1. At the May 30, 2018, PT initial evaluation, Petitioner reported her previous TBI and AS, and that "In Jan she had a flu shot and her pain seemed to worsen after that time. The pain is in the neck and upper traps and much worse on the L side with tingling and itching into the LUE. Around that time, she also lost her job and insurance and had to go off Humira…" Ex. 13 at 3. Physical examination found restricted and painful ROM throughout the neck and cervical spine. *Id.* at 3 – 4. ROM was "unremarkable" at the left shoulder, and full but somewhat painful at the right shoulder. *Id.* at 4. The therapist assessed Petitioner with a "recent worsening of chronic neck pain," *id.* at 5, and provided formal therapy (including instruction on home exercises) 1 – 2 times per week. *Id.*

---

[8] This neurologist was treating Petitioner after past concerns of seizures. *See* Rule 4(c) Report at 4 (internal citations omitted).

[9] As noted below, the records from this referring physician, named at Ex. 14 at 1, do not appear to have been filed.

At the last sessions in July 2018, she reported worsened "left-sided numbness and tingling," as well as worsened tightness in her upper trapezius and scalene muscles. *Id.* at 13, 14.

- Next, on August 23, 2018, Petitioner had a primary care appointment with resident Stephanie L. Frana, M.D. Ex. 2 at 314. Petitioner reported ongoing pruritis. *Id.* at 315. She also requested an updated PT referral to address, in addition to her neck pain, "L shoulder pain since getting a pneumonia vaccination in January 2018. Shoulder has tingling nerve pain and feels like 'sand is being poured' through her shoulder." *Id.* The physical examination findings were normal except for "excoriations along R [right] arm," with no specific reference to the left shoulder. *Id.* at 316. But Dr. Frana updated the PT authorization as requested. Ex. 13 at 24.

- Petitioner has not cited any further medical records addressing an ongoing vaccine injury or her overall medical status. *See* Amended Petition at ¶¶ 12 – 13.

- In contrast, Respondent has observed that the November 2018 PT evaluation again documented pain in the neck, as opposed to the vaccinated left shoulder. Rule 4(c) Report at 8, citing Ex. 13 at 31. And subsequent medical records documented new *right-sided* shoulder pain (in February 2019); bilateral carpal tunnel syndrome (with tendon releases in October and December 2020); and ongoing pain, numbness and hypersensitivity throughout her body. The differential diagnoses included ongoing brachioradial pruritis; AS; cervical radiculopathy; and/or fibromyalgia. *See generally* Rule 4(c) Report at 8 – 13 (internal citations omitted). Therefore, Respondent avers that Petitioner only had "fleeting" post-vaccination left deltoid pain – and any ongoing symptoms "appear to be part of a larger disease affecting many parts of Petitioner's body." *Id.* at 15.

- My own review of the later medical records identified that during an August 2019 rheumatology appointment, Petitioner declined another vaccination because she "had a bad arm problem with neurological pain during the PCV13 vaccine." Ex. 4 at 267. But that was not documented as an *ongoing* concern in August 2019, *see id.* at 263 – 267, or in any other medical records from my review.

- I have also reviewed Petitioner's recollections of developing left arm soreness and pain within hours of vaccination, and "stiffness, weakness, numbing, and tingling in [her] arm" by two weeks post-vaccination. Ex. 9 at ¶¶ 7 – 8. Petitioner recalls that her pain "went away" during her initial PT course (in May – July 2018), but she "could not fully use [her] left arm" later that summer, she requested additional PT for her shoulder in August 2018. *Id.* at ¶¶ 13 – 15. Petitioner describes "being able to adjust [her] way of doing things, so [she] does not feel too much pain in her [left]

shoulder" and that in August 2021, she had "recently start[ed] physical therapy in hopes of strengthening *both* shoulders." *Id.* at ¶ 16 (emphasis added)

### III.    Table SIRVA Dismissal

Petitioner's Table SIRVA claim is not feasible because she cannot establish the third QAI requirement of "pain and reduced range of motion [that] are limited to the shoulder in which the intramuscular vaccine was administered." 42 C.F.R. § 100.3(c)(10)(iii). Instead, the site of vaccination *at the deltoid muscle* was painful for several weeks. Ex. 2 at 255. But within one month post-vaccination, Petitioner's injury had evolved to include "nerve-type pain" as well as stiffness, weakness, numbness, and tingling throughout her left arm – radiating to her neck, and at times extending to her jaw. Ex. 3 at 318, 324. And subsequent medical examinations and assessments tended to focus on "neck" pain which was bilateral, even if "worse" on the left side. *See, e.g.*, Ex. 2 at 269 – 270; Ex. 14 at 77, 79, 82; Ex. 13 at 3. Petitioner's request for additional PT to address a purportedly ongoing left shoulder injury is not borne out in the medical records. *Compare* Ex. 2 at 314 (Petitioner's report) with *id.* at 316 (physical examination findings during the same encounter) *and* Ex. 13 at 31 (PT reevaluation record).

Moreover, when it was examined, Petitioner's left shoulder displayed normal ROM. *See, e.g.*, Ex. 2 at 255; Ex. 3 at 325; Ex. 13 at 4. This is an additional Table requirement under 42 C.F.R. § 100.3(c)(iii), *see Bolick v. Sec'y of Health & Hum. Servs.*, No. 20-0893V, 2023 WL 8187307, at *8 (Fed. Cl. Spec. Mstr. Oct. 19, 2023). For these reasons, the third QAI criteria cannot be met.

Petitioner also has not carried her burden to rule out "other condition[s] or abnormalit[ies] that would explain [her] symptoms." 42 C.F.R. § 100.3(c)(10)(iv). The condition or abnormality must qualify as an explanation for the symptoms a petitioner is experiencing, but need not be a better or more likely explanation. *Durham v. Sec'y of Health & Hum. Servs.*, No. 17-1899V, 2023 WL 3196229, at *13 – 14 (Fed. Cl. Spec. Mstr. Apr. 7, 2023). This Table element does not impose on Respondent the obligation to prove an "alternative cause" for the injury, but instead merely that the record contains sufficient evidence of a competing explanation to "muddy" a finding that vaccine administration was the cause.

In this case, Respondent argues that any post-vaccination left arm and neck pain "appear[s] to be part of a larger disease affecting many parts of Petitioner's body." Rule 4(c) Report at 14. And when discussing Petitioner's post-vaccination arm and neck pain, treating medical providers tended to discuss Petitioner's AS and CR – the latter of which is specifically listed as an exclusionary diagnosis in the Table. *See, e.g.*, Ex. 3 at 236; Ex.

2 at 268; Ex. 13 at 1, 5. The later medical records, discussed in Respondent's Rule 4(c) Report at 8 – 13, illustrate the ongoing complexity of her medical picture. Overall, this is a case with "significant and potentially confounding neurologic signs and symptoms [which is] better addressed on a causation-in-fact basis." *Durham*, 2023 WL 3196229, at *14.

Accordingly, Petitioner's Table SIRVA claim is **DISMISSED.**

## IV.    Order to Show Cause

I recognize that this Petition was filed without supporting medical records at a time when Respondent was proposing to remove SIRVA from the Vaccine Injury Table, and thus the filing of the matter with insufficient record proof in support may reflect a good faith effort to preserve any possible Table SIRVA claim. Nevertheless, the subsequently-obtained medical records demonstrate that no such claim is feasible. Accordingly, the only avenue left for success would be an off-Table causation-in-fact or significant aggravation claim.

If Petitioner wishes to proceed in such a manner, however, she must ensure that the evidentiary record is complete. To that end, she shall specifically obtain and file certified and complete copies of any outstanding and/or updated medical records – specifically addressing the following categories:

- Records stemming from a motor vehicle accident, and from several later emergency room and urgent care encounters. *See* Rule 4(c) Report at n. 1, 4 – 9.

- Dermatology records from at least one year pre-vaccination to the present. *See* Ex. 14 at 92 (scanned record of dermatology appointment, which references a prior appointment on Feb. 3, 2018).

- Neurology records. *See* Ex. 2 at 284 and Ex. 4 at 126 (PCP's referral to a specific specialist); Ex. 13 at 1 (reflecting that specialist's referral to PT).

Petitioner will be afforded one further opportunity to bolster her claim – but she should take this task seriously. Petitioner's failure to respond to this or other orders issued in this action, as well as failure to file required supporting evidence, will be interpreted as a failure to prosecute resulting in dismissal of Petitioner's claim. *Tsekouras v. Sec'y of Health & Hum. Servs.*, 26 Cl. Ct. 439 (1992), *aff'd*, 991 F.2d 810 (Fed. Cir. 1993) (per

curiam); *Sapharas v. Sec'y of Health & Hum. Servs.*, 35 Fed. Cl. 503 (1996); Vaccine Rule 21(b).

**Accordingly, by no later than Friday, March 14, 2025,** **Petitioner shall show cause why her off-Table claim should not be dismissed for insufficient proof and failure to prosecute.** Petitioner shall specifically file the outstanding medical records discussed herein, followed by a supplemental Statement of Completion, and a Status Report confirming whether or not she wishes to proceed with an off-Table claim.

If Petitioner states that the evidentiary record is complete, but she wishes to proceed with an off-Table claim, the matter will very likely be transferred out of the SPU – in light of the case's age and the complexities discussed herein.

In the alternative, if Petitioner wishes to exit the Vaccine Program, counsel shall file the appropriate motion, Stipulation, or Notice. *See* https://www.uscfc.uscourts.gov/vaccine-sample-filings.

        **IT IS SO ORDERED.**

                                                    **s/Brian H. Corcoran**
                                                    Brian H. Corcoran
                                                    Chief Special Master